GEORGE EDWARD CHANDLER *v.* STATE OF MARYLAND

[No. 213, September Term, 1974.]

*Decided December 17, 1974.*

The cause was argued before MORTON, MENCHINE and LOWE, JJ.

*Richard Karceski, Assigned Public Defender,* with whom was *Harold I. Glaser, Assigned Public Defender,* on the brief, for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Thomas R. Kane, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

The appellant, George Edward Chandler, was found guilty of murder in the first degree by a jury presided over by Judge Robert B. Watts in the Criminal Court of Baltimore. Chandler was sentenced to the jurisdiction of the Division of Correction for the balance of his natural life.

In this appeal two issues are raised: (1) was the trial judge in error when, over appellant's objection, he failed to exclude

evidence of prior offenses which were arguably neither connected in point of time nor circumstance to the instant case; and (2) was the trial judge in error when he failed to grant the appellant's motion for judgment of acquittal.

The victim of the murder was Diana Rosalyn Chandler, the appellant's estranged wife, who, at the time of her death, lived alone in an apartment in Baltimore City. Carolyn Smith, a co-worker of the deceased on the 11 p.m. to 7 a.m. shift at Western Electric Company, testified that when Diana Chandler failed to pick her up for work on Tuesday evening, March 13, 1973, and also failed to respond to her attempts to gain entrance to Mrs. Chandler's apartment, she became alarmed and notified the police the next day.

Officer Cannan, a Baltimore City policeman, testified that while working the 4 p.m. to 12 p.m. shift on March 14, he went to Mrs. Chandler's apartment in response to a "missing person call." When he could not gain entrance, he contacted the management of the apartment and a representative let him in with a pass key. He turned on a light and discovered Mrs. Chandler's unclad, lifeless body in the bedroom. According to the officer, there were no signs of forced entry, the windows were all locked from the inside and the lock to the front door was a dead bolt type requiring a key to lock and unlock it. After securing "the crime scene," he notified the "Crime Lab Mobile Unit."

According to the autopsy report, the body was examined at 9:40 a.m. on March 15, 1973, and at that time an electrical cord, cut from a television set, was found to be tightly wrapped around her neck. There were multiple stab wounds of her body, from one of which protruded the handle of a steak knife. The medical opinion was that death occurred between 9:40 a.m. and 9:40 p.m. on March 13, 1973, as a result of strangulation and multiple stab wounds.

A member of the police department's crime laboratory unit testified that of the fourteen identifiable fingerprints found in the apartment, ten of them belonged to the victim and four to the appellant. Appellant's prints were lifted from the bedroom door.

A police detective testified that he interviewed the

appellant on March 15, 1973; that the appellant advised him that he and Diana Chandler were married in August, 1969; that they had had financial problems resulting in quarrels during which he may have slapped her; that he had moved out of the apartment about the third week of January, 1973; and that on the day of the murder he had worked from 1:30 p.m. to 10 p.m. at the International Harvester Company in Baltimore. The detective stated that he obtained verification from the employer that the appellant had, in fact, worked that day. According to the detective, appellant voluntarily submitted to fingerprinting for comparison purposes and also to a benzidine test to determine whether bloodstains were on his hands. The latter test proved negative. In the course of his testimony, he stated that he found the keys to the deceased's automobile in her purse but found no other keys in the apartment.

The State then called William Brooks who stated that he was a co-worker of Mrs. Chandler's; that he had a key to her apartment; and that he had dated her at times during her marriage to the appellant.

A brother of the deceased testified that the first time he saw appellant after his sister's murder was at the wake and funeral. About a week or two later he saw appellant driving his deceased sister's car and, when he asked him how he obtained the keys, the appellant stated that he had found them in a drawer by his wife's bed.

A sister of Mrs. Chandler testified that sometime in June or July, 1969, prior to the Chandlers' marriage, she "looked out the window and George hit Dianna and picked her up and throwed her on the ground." During the summer of 1970, according to the witness, appellant had on one occasion "grabbed my sister and slammed her to the back of the wall" of an auditorium.

Belinda Jones testified that she had been a schoolmate of Mrs. Chandler and that once in January, 1971, Mrs. Chandler called her and asked if she could come over to her residence to stay awhile because "her husband had beaten her and knocked her on the bed and put the pillow over her head."

Sandra K. Pusateri testified that she met appellant and his wife about a year and a half prior to the trial at the "Adapt Center" and had seen him once knock her down a flight of stairs saying "* * * you are asking for it, one of these days I'm going to kill you."

Testifying for the defense, Janice McCullough stated that on March 13 and 14, 1973, the appellant was living with her in her apartment and was there when she left for work at 8 a.m. on each of those days; that she customarily telephoned him every morning at 11 a.m. and he always answered the telephone; that she had called him on March 13 and 14 and he had answered the telephone in the apartment both days.

The appellant took the stand and related a brief history of his marriage to the deceased, referring to several separations that had occurred. He stated that he moved back to his wife's apartment in September, 1972, and they lived together until the latter part of January, 1973, when they again separated and he moved out. He stated that on March 13, 1973, he worked the 1:30 p.m. to 10 p.m. shift at the International Harvester Company and that the first time he knew about his wife's murder was when his brother, Daniel, telephoned and so advised him.

We cannot agree with appellant's first contention that the trial judge was in error "when, over appellant's objection, he failed to exclude evidence of prior offenses, neither connected in point of time nor circumstance to the instant case."

It is certainly true, as appellant contends, that evidence of prior offenses committed by an accused are ordinarily not admissible, the theory being "that the jury may be misled into a conviction for an offense for which the defendant is not indicted, or that he may be prejudiced by the accumulation of offenses which he is not prepared to defend." *Gorski v. State,* 1 Md. App. 200, 202, quoting Wharton's *Criminal Evidence* (10th ed.). On the other hand, there are several well ingrained exceptions to this general rule. As stated in *Avery v. State,* 15 Md. App. 520, 532, quoting *Gordon v. State,* 5 Md. App. 291, 306:

"* * * evidence of other crimes is admissible to

prove the specific crime charged when such evidence tends to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. To like effect, see *Jones v. State*, 4 Md. App. 445; *Thomas v. State*, 3 Md. App. 708; *Gilchrist v. State*, 2 Md. App. 635; *Loker v. State*, 2 Md. App. 1; *Gorski v. State*, 1 Md. App. 200."

In the trial below, the State was clearly endeavoring to demonstrate the appellant's prior course of conduct toward his wife by establishing his belligerent and antagonistic attitude toward her on earlier occasions as related by the witnesses for the purpose of shedding light upon his motive and intent. Because of the remoteness of time in the related episodes and the vague and generalized nature of the testimony, we think that the admission of this evidence barely passed muster as being within the "motive" exception to the rule. On the other hand, we cannot say that the trial judge was wrong in admitting such testimony and we are fortified in this conclusion by the fact that the trial judge carefully and lucidly instructed the jury with respect to this evidence. His instructions bear setting forth here:

"Now, there has been testimony in this case which I've allowed in evidence with respect to other offenses committed by this Defendant. The general rule is that the test with respect to other offenses, that the testimony with respect to other offenses is inadmissible. The theory on which evidence of other offenses is excluded is that the jury may be misled into a conviction for an offense for which the Defendant is not indicted, or that he may be prejudiced by the accumulation of offenses which he is not prepared to defend. And I certainly ask you not to let that happen.

So, therefore, you are advised to consider testimony which I have admitted of other offenses,

that is, these other times when allegedly the Defendant attacked his wife, with respect to the crime that the Defendant is on trial in these proceedings, to the extent, and only to the extent, that it tends to establish a motive or an intent. Since this kind of evidence can be misleading, in other words, you can't say, well, he did this to somebody two years ago, so he must have done this. Since this kind of evidence can be misleading as to probative value, there must appear between the previous offense and that for which the Defendant is charged in these proceedings some real connection other than the allegation that the offenses have sprung from the same disposition. This evidence cannot be considered to show the propensity of the accused to commit crimes similar to that for which he has been indicted.

The reason for the general rule excluding such testimony is that such evidence would tend to divert the minds of the jurors from the real issue and arouse their prejudices. Where intent is material, the conduct of the accused is relevant to show that intent. Hence, evidence of collateral offenses is admissible in the trial of the main charge to prove the intent. To be admissible as relevant, such offense need not be exactly concurrent. If they are committed within such time, or show such relation to the main charge as to make connection obvious, such offenses are admissible to show intent. And if you remember, there was some testimony about these happenings about a year ago, and some forgot the date, but they weren't concurrent with this offense. If you don't find any connection with them, of course, you should not, and I say this advisory, accept them."

In view of these commendable instructions to the jury, we cannot perceive any prejudicial error suffered by the appellant by the admission of the evidence of his prior conduct toward the deceased.

We have considerably more trouble, however, in dismissing appellant's final contention that the trial judge committed reversible error in denying appellant's motion for a judgment of acquittal because the evidence was legally insufficient to support the jury's finding that he was guilty of murder in the first degree.

The only evidence adduced by the State remotely connecting the appellant with the commission of the crime was the detection of his fingerprints in the apartment where the crime occurred. The evidence was uncontradicted that appellant had lived with the deceased in the apartment until a few months before her demise. There was expert testimony that of the fourteen fingerprints lifted in the apartment and evaluated, ten were those of the victim and four were those of the appellant, the latter being found only on the bedroom door. An expert witness testified that it was possible for these fingerprints to remain in a detectable condition for a period of four or five months. The police department examiner who actually made the identification of appellant's fingerprints testified that there was, under the circumstances, no way to determine the age of the fingerprint. When asked specifically about a fingerprint on a door, the witness replied: "If the door is painted it could remain almost indefinitely depending on heating, drafts, and so forth. They all tend to dry them out."

It is, of course, well established that the finding of the fingerprints of an accused at the scene of a crime tends to show that he was at the scene of the crime. Additionally, however, for them to have any probative value there must be shown attendant circumstances with respect to the fingerprints which indicate that the prints were impressed by the accused at the time the crime was committed. "If they do so show, it is a rational inference, consistent with the rule of law both as to fingerprints and circumstantial evidence, that the accused was the criminal agent." *Lawless v. State*, 3 Md. App. 652, 659. *See also Rogers and Hawkins v. State*, 7 Md. App. 155, 159. Here, however, there has been no showing of attendant circumstances from which a rational inference might be drawn that the appellant's fingerprints were placed on the door of the victim's apartment at the time of

her murder. The appellant, testifying in his own defense, denied being in the apartment on the day of the murder or at any time after he stopped living there some two months earlier. No one placed him in the apartment on the day of the crime and the only testimony definitely placing him near the apartment after he had moved out was that of a witness who said she had seen the appellant go in and out of the apartment "about two weeks before she was killed."

We think, on the basis of all the evidence adduced below, it is an equally rational inference that the appellant's fingerprints were impressed upon the door of the apartment at a time when he was a resident or, at the least, at a time other than the day of the crime. As Chief Judge Orth said in *Rogers and Hawkins, supra,* at 164-165: "We feel that the evidence before the court was not sufficient for it 'to reasonably exclude the hypothesis' that the prints of the appellant[s] were impressed at a time other than that of the crime * * *. We recognize the integrity of fingerprint identification, but here, although it tended to show that the appellant[s] had been at the scene of the crime, it was not coupled with attendant circumstances sufficient to show that [he was] at the scene of the crime at the time it was committed, so as to give rise to the rational inference, consistent with the rule of law both as to fingerprints and circumstantial evidence, that [he was] the criminal agent[s]."

We are unpersuaded by the State's suggestion that the testimony of the deceased's brother that he had observed appellant driving the deceased's car a week or two after her death somehow contributes to proof of his criminal agency. It is true the brother testified that the appellant told him he found the keys in his wife's dresser drawer after her death, while a police officer stated that the only set of car keys he found was in the wife's purse and that he found no other keys in the apartment. We cannot find that this evidence points to appellant's guilt, particularly since it was uncontradicted that appellant had accompanied members of his wife's family to the apartment after the funeral in order to get her personal effects and close the apartment.

Nor can we subscribe to the State's argument that

evidence of appellant's prior hostile acts toward the victim are sufficient, when coupled with the other evidence, to establish his guilt. While such evidence goes to establish the appellant's motive, evidence of motive cannot supply the ingredients necessary to establish guilt. As stated in Wharton's *Criminal Evidence* (13th ed.) § 170: "Motive and intent are not synonymous. Motive is the inducing cause, while intent is the mental state with which the criminal act is committed. * * * As motive is ordinarily not an element of the crime charged, evidence of motive does not establish guilt * * *." While "[p]roof of motive is not required because motive is ordinarily not an element of a crime," the State may, however, "find it useful to produce evidence of motive in order to confirm *the conclusion reached from the other evidence* that it was in fact the defendant who had committed the offense charged." [Emphasis supplied.] Otherwise stated: "Motive and lack of motive are always relevant, but motive alone is not enough to support a conviction." Underhill's *Criminal Evidence* (6th ed.) 1973 § 5. *See also Van Dyke v. Commonwealth* (Va. 1955) 86 S.E.2d 848, 852; *State v. Jarrell* (N.C. 1951) 65 S.E.2d 304, 308; *Gilpin v. Commonwealth* (Ky. 1944) 178 S.W.2d 964, 965; *State v. Whisler* (Iowa 1942) 3 N.W.2d 525, 528; *Wittig v. State* (Wis. 1940) 292 N.W. 879.

Here, the State sought to establish motive but evidence of motive could only confirm a finding of guilt from other evidence demonstrating that it was, in fact, the appellant who committed the murder. From our review of the record, the State produced no such other evidence legally sufficient to establish appellant's guilt.

While we recognize that it is not for this Court to be convinced beyond a reasonable doubt of an accused's guilt, that being the province of the trier of facts, it is for this Court to be convinced that there is in the record before us evidence legally sufficient to entitle the jury, in this instance, to draw the conclusion that the appellant was guilty beyond a reasonable doubt. *Williams and McClelland v. State*, 5 Md. App. 450.

We are not so convinced and, accordingly, find that the

trial judge was in error in denying appellant's motion for a judgment of acquittal made at the close of all the evidence.

*Judgment reversed and case remanded for a new trial in accordance with the directions contained in Gray v. State, 254 Md. 385.*