## LESLEY CLINT WORTHEN *v.* STATE OF MARYLAND

[No. 499, September Term, 1978.]

*Decided March 22, 1979.*

The cause was argued before MOORE, LOWE and MELVIN, JJ.

*Isaac S. Kershner, Assigned Public Defender,* for appellant.

*Diane G. Goldsmith, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, George R. Sparling, State's Attorney for St. Mary's County,* and *John E. Pleisse, Assistant State's Attorney for St. Mary's County,* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

Lesley Clint Worthen was charged with statutory child abuse and common law assault and battery, each charge relating to an injury sustained by his stepchild. He was tried by a jury in the Circuit Court for St. Mary's County, which convicted him of assault and battery, but exonerated him from child abuse.

The State's evidence was admittedly thin, resting upon the two basic factors of underlying proof of a crime that were described to the jury by the State as being, 1. the proof that

"a crime has been committed," (*i.e.,* the corpus delicti) and 2. the proof that appellant committed it (*i.e.,* criminal agency).

At argument the prosecutor contended that he had proven the corpus delicti when

> "[t]he doctor got on the stand and told ... about examining the child, the determinations he made, and that this was in his opinion a battered, abused child."

The prosecutor acknowledged that proof of criminal agency was substantially more difficult, pointing out that when a victim is a two-year-old infant, there is no one to put on the witness stand and to point a finger—"the State's sort of up the creek . . . ." However, he also pointed out to the jury that the Court of Appeals has addressed the problem, and has somewhat lightened his burden.

> "So, the law recognizes that [neither] this Assistant State's Attorney nor any can call up a small child to point the finger, but it provides a way to point the finger."

Properly prefacing the new found solution with the appropriate caveat that "you cannot convict somebody here today based on a prior conviction," he said:

> "But in a situation where you have an essential factual material element to prove, like criminal agency, in a case which in fact involved a child abuse case, the Court of Appeals has said that it was admissible as evidence—this was referring to prior beatings — of other offenses which, 'has a natural tendency to establish or offers a reasonable presumption or inference as to a principal fact or issue or matter in dispute.' And, of course, we have an issue in dispute: Mr. Worthen being the guy that did it. *So, I can show to you that he has a tendency to do that by his prior acts."* (emphasis added).

The direct evidence of criminal agency of the crime charged, was that appellant had punished the child, a fact he

admitted but sought to explain as not having exceeded the bounds of parental propriety. Appellant sought to explain the child's more severe injuries by attempting to prove that certain of the injuries were accidentally received from sources unrelated to the punishment administered.

The case thus portended to be a very close one, turning almost entirely upon the degree to which appellant was believed by the jury to have corporally punished his stepdaughter. To convince the jury that the sole cause of the injuries was that Mr. Worthen *intentionally* exceeded the bounds of proper parental punishment, the State produced a witness who testified that Worthen had inflicted a recent similarly abusive punishment upon the child and that the witness had reported the incident to the authorities. It was this witness through whom the State intended to show that Worthen "has a tendency to do that [abuse the child] by his prior acts."

That the State intended to produce this witness was not divulged to appellant until the evening before the trial despite discovery having been propitiously sought. A continuance was prayed by appellant to investigate and plan a defense or counterattack. This was denied. Vehement objection was timely made to the introduction of the evidence but this too was overruled, and the testimony was as devastating as portended.

### The Trial Sequence

#### —motion for change of venue—

It is evident from the record that appellant was especially vulnerable to evidence of such a prior offense in St. Mary's County, a rural community environment where he had lived and where he was to be tried. In a pretrial hearing on appellant's motion for change of venue, appellant brought out that a series of front page articles had appeared in *"The Enterprise"* newspaper, "Southern Maryland's Leading Weekly Since 1883." The first of this series began under the headline "Child Abuse," and a subheadline, "It Does Happen Here." There followed the "lead" article reciting in bold print

the facts of a pending case presumably taken from an arrest report. The facts indicated it could have been none other than this case, although appellant's name was not used.

"On Jan. 22, 1978, 2-year-old Cathy H. lay in a hospital bed at Bethesda Naval Hospital, suffering from multiple bruises and abrasions and a blood clot on the brain. Eighty miles away her stepfather was incarcerated in the St. Mary's County Jail, charged for the second time with child abuse.

The arrest report said, 'On 1-21-78 at 0900 hours the above named defendant took his 2-year-old stepdaughter to the Naval Air Station Hospital for medical treatment. The child was examined by (a doctor) and the doctor found the child to have multiple contusions about the face, ribs, buttocks and legs. (The doctor) stated that the child has symptoms of a possible subdural hematoma caused by a blow to the head.'

'(The doctor) stated that his examination revealed that the child appeared to have been abused. (The doctor) ordered that a complete set of x-rays and photographs be taken of the victim. The child was later transferred to the Bethesda Naval Hospital for further treatment.'

'The defendant . . . stated that he disciplined the child on 1-21-78 prior to taking the child to the hospital for medical treatment. The defendant stated that the child was throwing a temper tantrum, so he struck the child with his hand on the child's buttocks.'

The Navy man was charged with child abuse and assault and battery and is awaiting trial in St. Mary's County Circuit Court.

'I have a very deep concern in this case,' Assistant State's Attorney John Pleisse said during a bond hearing. 'The same charge, involving the same child, was handled as an assault and battery in this court.' "

The articles that had followed during the three succeeding weeks dealt with various, often emotional, aspects of the crime of child abuse and the ways it should be handled as seen by others quoted in the media. In explaining what the "average public response to a child abuser" was, the paper quoted a county coordinator as saying, " 'Most people's reaction is to want to put them in jail.' " The articles quoted "authorities" in various human nature fields of endeavor. For example, a respected local doctor was quoted: " 'When a child is bruised by a parent, if that is not abuse, it borders on it . . . I believe in physical punishment. But I get very upset when I see a child that's been bruised.' " Expert opinions were summarized pointing to primary cause:

> " 'Most experts agree that child abuse repeats itself from parent to child, in a brutal, and sometimes deadly cycle.' ",

which set an identifying stage for Worthen's trial where the State elicited that appellant had also been an abused child.

Among the witnesses appellant produced to support his removal request was a parole and probation officer who had "cause to know" appellant officially.[1] The officer testified in favor of removal because he, like the prior witness, was certain that the facts outlined in *The Enterprise* were easily recognizable as appellant's pending case, and that

> "Because the case just about outlined his present circumstances, and I feel that if I wasn't in the capacity I am in and I just read the articles and I was on the jury, it would certainly be fresh in my mind as to how I would feel about the case when it came before me."

The trial judge inquired exclamatorily:

> "That would apply to any article about any crime being committed that somebody was charged with, wouldn't it?",

---

1. Inferentially appellant was on probation at the time for the prior charge subsequently commented upon by the State's Attorney.

to which the witness responded as expected:

> "Probably would, Your Honor, if it outlined the case."

Applying the testimony generally, the court asked:

> "You feel, then, if I understand your testimony to be that any such articles as to any defendant would deny him and he couldn't get a fair trial if it was published in a local paper that has general circulation around the county."

This elicited the witness' rationale that:

> "If it goes down the line as that one did outlining the emotional situations such as child abuse and it brings it fresh before the person's mind, I feel that they would prejudge the situation, same as the wife-beating articles that appeared not too long ago. They're very informative and I feel we need more of it; however, if someone's case, if it was outlined in those articles, if someone came before the jury for wife-beating charges within two weeks or a month of that, I feel it would be fresh on the jury's mind as to how they feel about the situation."

In other words:

> "It's fresh in people's minds and it does outline [t]his particular case."

In addition appellant called a clinical social worker from the St. Mary's County (Mental) Health Department who felt that appellant could not get a fair trial because:

> "I think they may have read the facts in the articles and made some decisions themselves about the cases that were presented."

He gave as an example four persons with whom he had discussed the articles.

> "Of the four people that spoke to me about the series it was evenly split. Two of them were saying that

child abusers should go to jail, should be punished, and the other two were just wanting to know how you work with that type of patient."

He was not inclined to believe that voir dire could eliminate the danger of preconceived prejudice. He felt a juror would not intentionally answer dishonestly, but stated that after reading the series of articles:

"I'm just saying it might be difficult for a prospective juror to be in touch with their feelings about child abuse. They may have some unconscious feelings about it."

The appellant himself then testified that in his own opinion he could not receive a fair trial in that county due to the series of articles — the first of which described him so vividly.

The State's Attorney was most candid, and probably more convincing than the witnesses, in stating that the case should be removed.

"Your Honor, if the Court please, I feel incumbent to make some comments about the articles, primarily and specifically the first article. I would like to be perfectly candid with the Court and state that the facts set forth in the first three and a half columns of that article, the short columns, are remarkably in detail similar to the Worthen case and in fact certainly must be the Worthen case: dates, times, places. I must also in complete candor indicate to the Court that what is set forth in this article as to the types of injuries which at the time of this article are, of course, allegation or would amount to a series of allegations all of which may not be substantiated by factual testimony. So, what Counsel has said is in fact true, that some of these things did not happen or cannot be medically proven, and that is based on our investigation.

. . .

. . . [M]y concern is that the connection of this factual situation with this series of articles does give me

some concern. Many times we very strenuously oppose removals. In this particular instance because of the most accurate or going beyond accuracy to the detriment of the Defendant in this case and then the following articles which deal with the general problem, which deals with psychological problems of the abuser and so forth, gives me some great concern.

Mr. Sparling and I have discussed this in detail not only today but even initially when Mr. Bailey indicated he would seek a removal some week or so ago, I indicated to him that I would not oppose it. And I don't know whether, though the State or the Defense can apply for it, I didn't feel that it was appropriate for us to make the motion, be the moving party, but yet I don't oppose it and I would either stipulate to it or consent to it, whichever would be the appropriate terminology."

The trial judge was unconvinced. He summarized the evidence as he viewed it and then, exercising his discretion under Md. Rule 744 (b) (*see Gibson, Tate & Austin v. State,* 17 Md. App. 246, 260 (1973)), he denied the request:

"The Court doesn't see it that way. I think these articles are somewhat of a factual disclosure. There's nothing in the articles that has any indication of trying to raise an outcry against those who may be involved in practices of child abuse. As frankly pointed out in one of the articles that the general reaction of the public to one who abuses a child, that he ought to be put in jail, but that's a normal reaction but that doesn't indicate prejudice.

The question is could this Defendant be tried by an unprejudiced jury? I don't see any affirmative showing here other than these articles and the skimpy testimony of Dr. Donahue or Mr. Donahue and Mr. Brown that makes any showing that he can't. Certainly it would seem to the Court that the voir dire that's permitted under our law is ample to weed out those who may be prejudiced against this

Defendant and who have prejudged the case either from the first article or any of these articles or from other information that they have received or because of just being biased against anyone who may be charged with a crime of this type. The Court, therefore, denies the Defendant's petition for removal."

— motion for continuance —

The judge's denial of a removal despite the damaging and detailed publicity, when coupled with the appellant's counsel having heard for the first time the night before trial that the State planned to produce a witness for the apparent purpose of testifying to a prior offense, added up to a need for an alternative tactic. Appellant sought some defense to offset the State's newly acquired witness and the prior offense boost to the State's previously none too stable case. Appellant moved for a continuance.

He advised the judge that even though he had propitiously prayed continuing discovery, the prior afternoon the State had first advised him of the witness that, at the last moment, it had decided to call.[2] The witness was concededly a harmful one. He was to testify, among other things, about a similar incident of appellant's abuse of the same child victim, a year before. That incident had resulted in the witness' reporting the abuse to the authorities. The court denied the motion for a continuance, but permitted counsel to interview the witness during the court's midmorning recess:

"Well, I probably will take a recess as usual around ten thirty, eleven o'clock, give them an opportunity

---

2. The State explained:

"Mr. Bailey has indicated that I first advised him of Mr. Fred Palmer being a potential State witness yesterday, and that is correct. When I determined that he would be a State witness between the hours of eleven a.m. and one p.m. after first meeting him, I immediately went to my office and called Mr. Bailey between the hours of one p.m. and two p.m., advised him of the name of this witness. I had not myself discovered this witness until over the weekend when my investigator found him, and I did not determine until between the hours of eleven a.m. and one p.m. that he would be called as a witness."

to, the Defense the opportunity to discuss the testimony, which is proper, and with his client, and at that time we fail to see any prejudice that would be given to the Defendant, so the motion for continuance will be denied."

— jury selection and voir dire —

The court proceeded with the jury selection. Nine of the jurors of the nineteen member panel remaining (after several were stricken for cause) had read *The Enterprise* articles but assured the court that this fact would not prevent them "from reaching a fair and impartial verdict based upon the evidence in this case." That alone might give pause to appellant, but he asserts a more serious concern.

Among the many questions asked to assure "impartiality and lack of bias," the court asked:

"Do any of you disapprove of physical discipline in the rearing of children?"

The court excused two jurors who indicated such belief might affect their decision. A third answered hesitatingly, but was not excused.

"JUROR: Edward Smith, No. 24.
THE COURT: You disapprove of the physical discipline in the rearing of children, is that correct, sir?
MR. SMITH: (No response)
THE COURT: Would this fact prevent you from reaching a fair and impartial verdict based upon the evidence in this case?
MR. SMITH: I would like to think not.
THE COURT: I can't hear you.
MR. SMITH: I think not.
THE COURT: Very well, sir, you may be seated."

In light of the 9 jurors who admitted having read some of *The Enterprise* articles, appellant again renewed his motion

for removal before proceeding to exercise his peremptory strikes. It was again denied. Appellant then asked:

> "I would move that Juror No. 24, Mr. J. Edward Smith, because of his answer to question number seven, he was very hesitant in answering that question and he indicated that he thought not, but I still feel, Your Honor, because of this hesitancy he has displayed to the Court a real reservation as to his ability to fairly sit on this trial, and I would ask that he be excused by the Court."

The court denied the motion with reasoning, the last part of which was not too reassuring: [3]

> "I think the mere fact that he hesitated shows that he's given it reflection and thought, rather than just answering it offhand. Of course, the Court notes that you have your strikes, so that's the reason we do allow certain people to get off."

The State then conceded one of its strikes of the 19 person panel, in order that the combined challenges would leave 12 jurors able to serve.

Counsel then renewed the motion for a continuance relative to the surprise witness. He asked for time to investigate the serious accusations of a previous incident of the same nature

---

3. Obviously, an erroneous failure to excuse for cause is not cured by a subsequent peremptory challenge. *See* Alexander v. Grier & Sons Co., 181 Md. 415, 421 (1943); Lockhart v. State, 145 Md. 602, 613 (1924). On the other hand, appellant's argument before us was neither persuasive nor "evident" in stating:

> "The record indicates that Appellant exercised the peremptory challenges to which he was entitled. It is further noted that the State had agreed to exercise only three peremptory challenges since there were only nineteen panel members, and a disqualification of the subject juror for cause would have further reduced the State's peremptory challenges. In this context, the constraints against the objective exercise of discretion by the court are evident."

If the juror should have been removed for cause, it was error not to do so, but a failure to excuse him without cause is not error prejudicial to appellant despite the lost advantage of arguably diminishing the State's peremptory challenges. While the State may have declined to exercise some of their challenges for practical reasons, they were not bound to do so.

and to "have the opportunity of possibly having rebuttal witnesses against them." Although the State did not object to "passing the case" (pointing out that both Thursday and Friday of that week were open for the court and the State), the court denied the motion, suggesting that the defense counsel have an investigation conducted during the trial, before the State got to the witness.

> "THE COURT: Well, he's going to take some time. Couldn't you have your investigator go out now and check this out? You have one assigned to your department, don't you?
>
> MR. BAILEY: I have a fellow available to me, Your Honor, but, you know, a couple hours' notice is not, would not give my man an adequate opportunity. I believe my schedule basically, I think my schedule is basically open for Friday.
>
> THE COURT: Well, the Court doesn't feel inclined at this time to grant a continuance. Go ahead and see how things develop. I don't know what the fellow will testify to. So, the motion will be denied."

— the trial —

The trial itself boded no better for appellant. His renewed motion for continuance and preliminary objections to prior offense testimony about to be elicited from the surprise witness were all denied.[4] Not only was the testimony of the prior offense devastating, but the newly discovered witness closed his direct testimony with a clearly objectionable

---

4. When the witness was called, appellant again objected, this time on two grounds. First, he contended that the proffered testimony was inadmissible, because of the prior offenses rule. That was denied by the trial judge. Appellant then renewed his motion on the ground that Palmer was a surprise witness. The Court again denied it.

> "THE COURT: The Court recessed court for approximately forty-five minutes during which time you had an opportunity to talk to him.
>
> MR. BAILEY: I will admit that I had a—
>
> THE COURT: And I saw you discuss his testimony with your client, so the motion will be denied.
>
> MR. BAILEY: I would like to point out for the record I did not have an opportunity to interview any witnesses as far as discrediting his testimony."

remark relating to "the sexual assault on the baby, or whatever," despite there being no evidence whatsoever of a sexual assault. Objection, followed by a motion to strike, were both denied.[5]

But apparently during cross-examination the trial judge had some second thoughts. He called counsel to the bench and had the reporter read the last two questions and answers given on direct examination. Upon hearing them, he decided to instruct the jury to strike the response:

"Mr. Foreman, ladies and gentlemen of the jury, during the testimony of Mr. Palmer he made a remark relative to sexual assault. The Court feels that that is a conclusion and will ask you at this time to disregard that remark and it will be stricken from the record and you will not consider that when you consider your verdict in this case, nor will the

5. "Q What did Mr. Worthen relate to you when you told him or invited him to go to the minister? Just go through what he said to you.

A Okay. He said, 'I'm sorry for what I done. I didn't mean to do it. I've lost my temper, I can't control my temper, and I need help to get rid of my problem. I know I did it, but I know it's wrong and I've got to do something to get it straight.' So, I took him over there myself and set up an appointment.

Q Now, when he made that statement to you, what was he referring to, if you know?

MR. BAILEY: *Objection,* Your Honor.

THE COURT: *Overruled.*

THE WITNESS: Beating of the baby and the sexual assault on the baby, or whatever.

MR. BAILEY: *Objection,* Your Honor.

THE WITNESS: And he—

MR. BAILEY: *Objection, Your Honor. Move that that be stricken.*

THE COURT: *Overruled.*

MR. PLEISSE: No further questions.

MR. BAILEY: May I approach the bench?

(Counsel approached the bench where the following proceedings were had out of the hearing of the jury)

MR. BAILEY: Your Honor, there's been testimony here of possible sexual abuse, something that I know nothing about, something that's in front of the jury. I move at this time for an immediate mistrial in this particular matter. I had absolutely no opportunity to prepare any type defense against this type allegation. It's in front of the jury and I don't think there's any way this jury could render a fair and impartial verdict in this case, and a mistrial should be granted immediately.

THE COURT: He's testified as to what he observed and what the conversation was. The motion's denied." (emphasis added).

34

attorneys, any of them, further make mention of this."

It is to be assumed that the jury followed the instruction, *Gerstein v. State,* 10 Md. App. 322, 329 (1970), although some of the finest legal minds have been the harshest critics of curative instructions, calling them "intrinsically ineffective," *Paoli v. United States,* 352 U. S. 232, 247 (1957) (Frankfurter, J., dissenting), and referring to their penchant for purging prejudice as "unmitigated fiction." *Krulewitch v. United States,* 336 U. S. 440, 453 (1949) (Jackson, J., concurring). *See McKnight v. State,* 280 Md. 604, 615 (1977). Despite the merit of such reasoning (see *Pearson v. State,* 28 Md. App. 196, 203 (1975), dissenting opinion, *cert. granted,* 276 Md. 748 (1975)), it is wrong. *Pearson v. State,* 28 Md. App. 196, *cert. dismissed as improvidently granted,* No. 113 (filed March 4, 1976).

— the instructions —

The case concluded as it began. Appellant's attorney (John D. Bailey, Esquire) asked for a mitigating instruction which would have comported with his defense. He pointed out to the trial judge that:

> "The only other thing that I have, Your Honor, on page 203 of Maryland Jury Instructions, page 203 starting with 'A person ...', you read all of that section that applies to the conviction, you know, but not those areas of mitigation." [6.]

What the judge instructed was verbatim from D. Aaronson, *Maryland Criminal Jury Instructions and Commentary* 203 (1975). He said:

> "Under child abuse, 'the offense of child abuse is committed when any parent, adoptive parent or other person who has the permanent or temporary care or custody or responsibility for the supervision of a minor child maliciously beats, strikes or

---

6. The State contends that this was insufficient to preserve the question for appeal, but see Sergeant Co. v. Pickett, 283 Md. 284 (1978).

otherwise mistreats such minor child to such degree as to require medical treatment.

In order for you to find the Defendant guilty of this offense the State must prove beyond a reasonable doubt that, one, the victim was a child under the age of eighteen; two, the accused is either the parent, the adoptive parent or other person having the permanent or temporary care or custody or responsibility for the supervision of the child; three, there was a physical injury or injuries sustained by the child; and, four, the physical injury or injuries resulted from cruel or inhumane treatment or as a result of a malicious act or acts.

The Defendant must have knowingly and wilfully caused injuries, and these injuries must have required the care and treatment of a physician.' " [7]

The court denied Mr. Bailey's exception to the charge.

"You can argue that to the jury. I think the gist of it is in there."

The portion omitted over appellant's counsel's objection was most significant. It read:

"A person is not guilty of this offense [child abuse] if he had good intentions but exercised bad judgment. If the child was injured in a fashion consistent with reasonable norms of parental control then the defendant is not guilty. Unless you find that the defendant substituted a willful and malicious desire to inflict harm and pain in place of a genuine effort to correct the child by acceptable means, you must find the defendant not guilty." D. Aaronson, *Maryland Criminal Jury Instructions and Commentary* 203.

— the argument —

With no other recourse, Mr. Bailey took the advice of the court and argued the omitted instruction to the jury

---

7. Quotation marks were inserted by this Court to indicate what was read from Aaronson.

explaining that it was the next succeeding paragraph in the book from which the judge had read. Even then, it was turned to appellant's disadvantage when the prosecutor pointed out in his closing argument that the judge had chosen not to read those instructions, thereby implying a judicial sanction of the State's position.

> "Mr. Bailey talked about the fact that, and he read some additional instructions, ones which the Judge chose not to read, by the way, about this had to be done knowingly and wilfully by the Defendant. You heard the Judge read the statute from Article 27, Section 35A. Nothing in that statute on child abuse that said it had to be wilful or knowingly done. It did say it had to be inhumane or maliciously done. Malice can be inferred from actions, the intentional doing of something can infer malice. Doing something even without intent can show malice just by the mere action."

Having been convicted of assault and battery—but not of child abuse—appellant points to the denial of his motions in every instance, from removal to instructions, as an abuse of discretion. He adds as an additional reason for us to reverse that:

> "The child abuse statute, Article 27, Section 35A preempts and supersedes the common law crime of assault and battery upon a child by a parent or person acting *in loco parentis* and precludes Appellant's conviction and criminal liability for the offense under the common law."

### The Appeal

#### — preemption —

For purposes of this case, we can with short shrift dispose of appellant's additional contention. It relies primarily on our borrowed observation in *Dill v. State,* 24 Md. App. 695, 703 (1975), *quoting State v. Salafia,* 29 Conn. Supp. 305:

> " 'When there is disparity in the punishment

applicable to the offense as a common-law crime and as a statutory violation, it would be a palpable absurdity to hold that the common law had not been supplanted by the statute.' "

To carry appellant's reasoning to its logical conclusion by judicially imputing such legislative intent in the instant case, would also be a "palpable absurdity." If assault is supplanted by applying this test to the child abuse statute, so would the other related offenses, including all sex crimes and homicide crimes, when committed by one *in loco parentis* against a child victim. If one believes the Legislature's answer to its obvious concern over crimes against children was to limit the punishments therefore—now that would be absurd!

But it may be even more absurd for us to decide this question. It was not raised or decided below. Md. Rule 1085. Because of its apparent facial absurdity and factual posture, it is unlikely that the issue will cause serious concern if it is raised upon remand, as upon a res judicata—double jeopardy attack. To establish standing to raise that question (or even in order to have argued the question here), appellant must show that he was in loco parentis, *see Pope v. State,* 284 Md. 309 (1979), *as a matter of law,* since no one can know for certain whether the assault conviction indicated that the jury found him to be a surrogate parent who exceeded his prerogative or—just as likely—a non-parent who had no right to punish the child physically at all. Absent conclusive evidence thereof, we are reluctant to assume such standing in appellant in order to anticipate an unconvincing constitutional argument. But that is the only ground upon which appellant did not convince us in this appeal.

— prior offense —

The issue upon which we will reverse was the admission of the evidence of the prior offense which was admitted upon precedential authority of this Court in *James v. State,* 5 Md. App. 647, 651 (1969), wherein we pointed to *Fabian v. State,* 235 Md. 306 (1964) as

"a case involving assault and battery upon an infant child, where it was held that testimony of a witness

who was not present when the crime was committed that the accused beat the infant 'all the time' was admissible as evidence of other offenses which 'has a natural tendency to establish, or offers a reasonable presumption or inference as to, a principal fact at issue or matter in dispute. ' "

If the prosecutor and the trial judge were drawn by our view of a case that might have been restricted to its facts, they were preceded by good company. *See, e.g., United States v. Woods,* 484 F. 2d 127, 133 (4th Cir. 1973), *cert. denied,* 415 U. S. 979 (1974).

But neither *James* nor *Fabian* was intended to carve out a new exception for child abuse cases that would compel admissibility contrary to the general rule. The general rule provides that in a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible. *Ross v. State,* 276 Md. 664 (1976). Nor do *James* and *Fabian* necessarily fall within a recognized exception to the rule (although they may well fit one) because the rule of exclusion presupposes irrelevance.

As we made clear in *Hoes v. State,* 35 Md. App. 61 (1977), the exclusionary rule applying to other offenses does *not* apply unless the prior offenses have *no* relevancy to the crime charged. It is only after the fact of irrelevancy is determined that the five exceptions of 1) motive, 2) intent, 3) absence of mistake, 4) common scheme, or 5) identity, need be invoked.

*Ross v. State, supra,* and those cases evolving therefrom, did nothing to change this; instead, *Ross* expressly acknowledged it by stating the prerequisites to invocation of the exclusionary rule, and sub silentio by citing as authority cases that have · held directly that prior offenses are admissible when the prior offense is relevant to prove the offense charged.

"The frequently enunciated general rule in this state, followed uniformly elsewhere, is that in a prosecution for a particular crime, evidence which in

any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmissible. *Harrison v. State,* 276 Md. 122, 345 A. 2d 830 (1975), *MacEwen v. State,* 194 Md. 492, 500, 71 A. 2d 464 (1950); *Young v. State,* 152 Md. 89, 91, 136 A. 46 (1927); *Weinstein v. State,* 146 Md. 80, 88, 125 A. 889 (1924); *Wethington v. State,* 3 Md. App. 237, 240, 238 A. 2d 581 (1968); *Gorski v. State,* 1 Md. App. 200, 202, 228 A. 2d 835 (1967). This principle is merely an application of the policy rule prohibiting the initial introduction by the prosecution of evidence of bad character. Thus, the state may not present evidence of other criminal acts of the accused unless the evidence is 'substantially relevant for some other purpose than to show a probability that he committed the crime on trial because he is a man of criminal character.' C. McCormick, Evidence § 190 (2d ed. 1972)." *Ross v. State,* 276 Md. at 669.

Indeed, that which we have cast in the mold of "exceptions" are not really exceptions at all; each relates to some ingredient of relevancy.

"There are exceptions to this general exclusionary rule which, perhaps, are equally well-recognized. Thus, evidence of other crimes may be admitted when it tends to establish (1) motive, (2) intent, (3) absence of mistake, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, and (5) the identity of the person charged with the commission of a crime on trial. *Wentz v. State,* 159 Md. 161, 164, 150 A. 278 (1930); *Cothron v. State,* 138 Md. 101, 110, 113 A. 620 (1921); *Chandler v. State,* 23 Md. App. 645, 650, 329 A. 2d 430, *cert. denied,* 274 Md. 726 (1974); *Wethington v. State, Gorski v. State,* both *supra.* Additional exceptions have also been recognized: When the several offenses are so connected in point of time or

circumstances that one cannot be fully shown without proving the other, and to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial, *Berger v. State,* 179 Md. 410, 414, 20 A. 2d 146 (1941); and to prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. C. McCormick, Evidence § 190, *supra.*" *Id.* at 669-670.

By looking to the language of such cases as *Young v. State,* 152 Md. 89, 91-91 (1927); *Wilson v. State,* 181 Md. 1, 3 (1942); and *Jones v. State,* 182 Md. 653, 657 (1944), we observed in *Hoes, supra,* that the term "relevance" was better described as a showing of a "logical connection," *Hoes, supra* at 65-69, between the crime charged and the prior offense. *See Berger v. State,* 179 Md. 410, 414 (1941); *Bryant v. State,* 207 Md. 565, 586 (1955). The "logical connection" may be a causative factor interrelating the past and present offenses, such as with motive or common scheme; or, it may be unrelated causatively but circumstantially related, as in necessarily disclosing a past offense discussed by an accused at the scene, in order to prove his identity or to prove absence of a mistake in identity. *Mollar v. State,* 25 Md. App. 291 (1975). But even more relevant or more "logically connected" is the instance where the proof of the crime charged requires a specific intent in addition to the intentional doing of the criminal act itself. *Hoes, supra* at 69.

In a child abuse case, by virtue of its application only to those in *loco parentis, see Pope v. State, supra,* an accused begins with a permissible degree of corporal punishment of a child for which he or she as a parent figure cannot be held accountable. Beyond that even, the person is not guilty if his intentions were good, but his judgment bad, in exercising his right to punish. *But see State v. Fabritz,* 276 Md. 416 (1975); *Pope v. State, supra* at 320, n. 10. That was as true for common law assault by a parent prior to legislative action as it is now under the child abuse statute. *Fabian, supra.* So it is both logical and relevant that prior intentional excesses in administering corporal punishment are indicative of evil

intent to overcome a bad judgment burden. Both *James* and *Fabian* meant not that such evidence is admissible per se, but only that the relevance obstacle to its admission is overcome. This does not detract from the message of *Ross,* however,

"that the introduction of evidence which shows other offenses by the accused should be subjected to rigid scrutiny by the courts because of the great potential for danger which characterizes it." *Id.* at 671.

It is only after the relevancy exclusion obstacle is overcome that the "rigid scrutiny by the courts" need come into play. As we pointed out in *Mollar v. State, supra* at 294, and *Hoes, supra* at 70-72, this "scrutiny" is conducted by the use of a balancing test, a procedure subsequently described in *Cross v. State,* 282 Md. 468 (1978), when the Court of Appeals sanctioned its use with the imprimatur of finality:

"But it should be remembered that, though the evidence may fall within one or more of the exceptions, the trial judge still possesses discretion as to whether it should be received. In the judicious determination of this issue he should carefully weigh the necessity for and probativeness of the evidence concerning the collateral criminal act against the untoward prejudice which is likely to be the consequence of its admission. *Harris v. United States,* 366 A. 2d 461, 463-64 (D.C. 1976); *see McKnight v. State, supra* at 612-13 [556]. *See generally McCormick on Evidence, supra,* § 190, at 453-54. In some cases, this may require that evidence of the criminal actions of the defendant be totally excluded; in others, admission of portions or all of the evidence of the defendant's specific criminal actions may be permissible." *Id.* at 474.

The record here does not indicate whether the court applied this test or not, although it is clear that the frightening potential for prejudice was persuasively—if not convincingly—argued to his honor. Since it is appellant's burden to prove that the court did not do that which is

expected of it, *Langrall, Muir & Nopp'r v. Gladding,* 282 Md. 397 (1978), we cannot question that the judge did exercise his discretion. We may only determine whether the result was an abuse thereof.

To find an abuse of discretion we must begin with the premise that the discretionary rulings of trial judges carry a "presumption of validity" which is described in a case cited for that principle in *Mathias v. State,* 284 Md. 22, 28 (1978):

> "There is, of course, a presumption that the discretion vested in the trial court 'was not abused but was exercised with just regard to the rights and interest of both the plaintiff and the defendants,' . . . ." *I. W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 19 (1975).

This presumption is necessarily of the Thayer-Wigmore variety which is

> "only viable in the absence of certainty, or until certainty or evidence of greater persuasion than that having given rise to the presumption, can be ascertained." *Rose and Crown, Ltd. v. Shaw Ent.,* 28 Md. App. 548, 555 (1975).

To seek such "evidence of greater persuasion" on appeal, we are told by *I. W. Berman Prop., supra,* that we are not confined to the evidentiary incident in isolation, but may review it in context with all of the circumstances of the case as reflected by the record:

> "[T]hus the burden is upon the appellant of establishing that 'according to the equity and justice appearing between the parties *on a consideration of all the circumstances of the particular case as disclosed at the trial,'* the trial court abused its discretion and worked an injustice to the appellant . . . ." *Id.* at 19-20 (emphasis added).

This language expressly directs us to take a panoramic view of the entire trial. It implicitly directs that we recognize the trial judge's area of discretion as proportionately circumscribed throughout the trial by each exercise of

discretion that he is called upon to make. The extent to which his discretion is circumscribed varies proportionately with the contextual relationship of the subject matter decided, to that to be decided. It is also proper that we view what was done initially in light of what transpires subsequently.

Assuming as we must, that the judge below applied the balancing test in admitting the prior offense evidence, it is clear that the balance should have been on the side of exclusion, especially in light of his prior discretionary denials. The factors of importance militating toward exclusion of the evidence are interwoven with his previous and subsequent decisions.

As pointed out by *Ross, supra* at 669 (citing *MacEwen v. State,* 194 Md. 492 (1950)), unless an accused knows in advance that evidence of other crimes is to be used against him, the accused will be unprepared to defend against such evidence. Having denied a continuance to appellant that was requested for the express purpose of investigating the prior offense allegations and seeking whatever might exist to counteract that evidence, the trial judge narrowed the perimeters of his discretion to admit the highly prejudicial evidence of a prior similar offense upon the same victim.

—— continuance ——

If such evidence, belatedly disclosed, was to be admitted, a continuance was imperative to permit preparation of a defense against such evidence. As indicated by the prosecutor, neither he nor the court would have been harmed by a continuance and, although appellant could not proffer the customary prerequisites for continuance of a witness's name, facts he would prove, or even a reasonable expectation that such evidence would be competent and material, it was obvious that if such evidence was available, the case could not be fairly tried without it. *Bryant v. State,* 232 Md. 20, 21 (1963). The proffer was necessarily vague (*i.e.,* possible impeachment of the surprise witness) because of no opportunity to develop further possibilities; however, the record reveals that there was another person in addition to

the State's witness, at the prior offense. The State's witness recalled:

> "another man . . . Jerry Thero, I think that's his name; I'm not real sure."

Thus, it appears that "on a consideration of all the circumstances . . . disclosed at the trial," *I. W. Berman Prop.,* *supra* at 20, the trial judge abused his discretion either in denying the continuance, or admitting the prior offense testimony — or both. The judge apparently did not recognize in either of these instances that the discretion left to him, following his denial of the removal request and the refusal to strike the equivocal juror, had already been circumscribed.

— the motion to remove —

In denying the removal the judge may not have abused his discretion if viewed in isolation, despite the fact that the State not only failed to contradict the suggestion that appellant could not have a fair and impartial trial but even acquiesced in that suggestion and urged removal. The effect of a prosecutor's acquiescence has never been addressed in Maryland, but guidance is given tangentially by the Court of Appeals:

> "When, therefore, a suggestion that a party cannot have a fair and impartial trial, supported by affidavit, is filed in a court where a case is pending, it is the duty of the court to order a removal of the record to some jurisdiction where the jury will not be prejudiced. If it appears doubtful that the juries in a given circuit would be fair and impartial, the case should be removed to some other circuit or some other section of the State. Without rehearsing the allegations contained in the petition of the accused for a change of venue, it is sufficient to say it contains averments which, *not being contradicted by the State, must be taken as true, and cast a grave doubt upon the question of whether the accused could have obtained a fair trial before a jury in*

*Wicomico County." Jones v. State,* 185 Md. 481, 486 (1946) (emphasis added).

The Court of Appeals has also indicated, however, that the suggestion of public prejudice may be overcome by cleansing voir dire indicating that the jurors' states of mind are without bias or prejudice. *See Garlitz v. State,* 71 Md. 293, 299-301 (1889). This has been more recently indicated by the Supreme Court of the United States in *Irvin v. Dowd,* 366 U. S. 717, 722-723 (1961):

> "It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

Yet, so close an issue in the face of the prosecutor's acquiescence, provides a questionable atmosphere, with a lingering (if unlikely) possibility of preconceived opinions toward those who administer corporal punishment to children being harbored by jury panel members. The equivocal juror, for example, clearly expressed his philosophical opposition to any corporal punishment, and 8 of the other persons admitted exposure to the reportorial editorializing that had singled out appellant's case and indicated his prior offense. Such indication itself could have helped to associate subconsciously appellant's case with that initially reported. Furthermore, among those exposed to potential inflammation, evidence of repeated offenses becomes all the more harmfully indicative

of guilt, not only properly through the "intent"-to-abuse channel, but more likely through the "bad man" theory, or a leopard who can't change his spots analogy. *See Hoes v. State,* 35 Md. App. at 71. The evidence's prejudical effect was not outweighed by the probative value of the other offense evidence, *see Brafman v. State,* 38 Md. App. 465, 475 (1978), despite the State's desperate need to bolster its case. The greater the need by the State, the more harmfully prejudicial it becomes.

By his very first acts then, the trial judge had substantially restricted his remaining scope of judicial discretion. When he denied the removal and declined to strike the equivocal juror for cause, he implicitly assumed added responsibility in guaranteeing that the remaining jurors would not be biased despite possible preconceptions from their previous exposure. This assurance could not be evinced by keeping out of the case any questionable evidence which would more clearly link appellant to the articles, but which was not directly related to the immediate offense. The judge failed to do that, or even to provide appellant with an opportunity to offset or defend against the belatedly disclosed import of such evidence.

— the missing instruction —

In our panoramic view of the case we perceive one further error clearly related to the four already discussed, the refusal to give the jury a mitigating instruction that set forth the very essence of the defense upon which appellant relied. Appellant had admitted punishing the child; his defense rested solely upon the assertion that he had not exceeded the bounds of parental propriety. By denying to so instruct, but suggesting it be argued, the judge permitted the State to capitalize upon the error, thereby increasing rather than eliminating the omission's harmfulness. *See State v. Pratt,* 284 Md. 516 (1979) at 522.

It is apparent, therefore, that the appellant has met his burden of establishing that, " 'according to the equity and justice appearing between the parties on a consideration of all the circumstances of the particular case as disclosed at the trial,' the trial court abused its discretion and worked an

injustice to the appellant." *I. W. Berman Prop., supra* at 19-20. Viewed through the stereoscope of retrospect, the trial court abused its discretion in every exercise brought to our attention.

We will reverse, but because there was sufficient evidence remaining—if admittedly thin—to sustain a verdict, we will remand for a new trial. *Mackall v. State,* 283 Md. 100 (1978).

> *Judgment reversed.*
> *Case remanded for new trial.*
> *Costs to be paid by St. Mary's County.*