759 A.2d 1136

James Mckinley FONTAINE

v.

STATE of Maryland.

No. 1604, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Sept. 28, 2000.

---

2. Act I, Scene v.

276

Bradford C. Peabody, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Devy Patterson Russell, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General, Baltimore and David R. Ruark, State's Atty., for Wicomico County of Salisbury, on the brief), for appellee.

Submitted before MOYLAN, KENNEY, ROBERT F. FISCHER (Ret'd, specially assigned), JJ.

KENNEY, Judge.

Appellant, James McKinley Fontaine, was convicted by a jury in the Circuit Court for Wicomico County of second degree murder. He was sentenced to a twenty-five year term, to run consecutive to the five-year term imposed for a handgun conviction at his previous trial.[1] Appellant presents one question, which we have separated into two:

I. Did the trial court err in refusing to allow defense counsel to admit extrinsic evidence of a prior inconsistent statement by a State's witness who had been excused the previous day?

II. Did the trial court err in refusing to grant a continuance to allow defense counsel to subpoena the witness to testify again?

Perceiving no error, we affirm the judgment of the circuit court.

## FACTS

On the night of April 18, 1994, appellant and his stepson, Keith Long, got into an argument over telephone calls made by Long on appellant's telephone. The argument ended in the fatal shooting of Long.

At the time of the shooting, appellant was married to Patricia Winder. She and her daughter (Long's sister), Keisha Long Mitchell, lived with appellant at 1117 West Road in Salisbury. Long was Winder's son from a previous marriage, and, while he did not live with Winder and appellant on a

---

1. Appellant was initially tried for this offense in 1995 and convicted of second degree murder, assault with intent to murder, and use of a handgun in a crime of violence. He was sentenced to a term of twenty-five years' incarceration for the murder conviction and to a consecutive term of five years' incarceration for the handgun conviction. The assault conviction was merged into the murder conviction. In 1997, as a result of a post-conviction proceeding based on ineffective assistance of counsel, appellant was granted a new trial on the murder conviction.

permanent basis, he stayed with them off and on. At the time of his death, Long had no fixed address.

When Long came to the Fontaine home that night, his sister was taking a bath, appellant was in the living room watching television, and his mother was in a bedroom. Long entered the house, went into the bedroom, and asked Winder whether he had received any telephone calls. She advised him that he had not because appellant had disconnected the telephone. Long took some of his clothes from the house and put them into his car. When he returned to the house, he told his mother that he would see her at some point in the future and that he was going to talk to appellant about the telephone before he left.

According to Winder and Mitchell, Long walked into the living room where appellant was sitting on the couch and asked him why he disconnected the telephone. Long then told appellant to stop blaming his mother and sister for something that he had done. Appellant responded that Long could "blame his mammy for hiding the telephone bill." Long responded that he had a "mom" and not a "mammy." Appellant then came around the couch, grabbed Long around the neck, and the two men "tussled."

Long pinned appellant to the floor and asked: "Why did you grab me, all I wanted to do was talk to you." Long then got up and went into the kitchen while appellant got up off the floor and headed to the bedroom. Winder told Long to leave because she knew appellant was going to get the gun that he kept in the bedroom. Mitchell then ran outside to a neighbor's to call 911.

Lemont Antonio Whittington testified that, at the time of the argument, he was next door visiting his mother. He heard arguing and went outside to determine what was going on.

Winder, Mitchell, and Whittington testified generally that they saw appellant come down the steps and shoot Long several times. Appellant then pulled Long out of the car, kicked him, and shot him once more. Both Winder and Mitchell heard appellant say something along the lines of

"don't be beating me up in my own house." Appellant then pointed the gun at Winder and threatened to kill her. Whittington also heard these threats.

According to appellant, Long walked into the living room, stood behind him, and told him he was sick and tired of the telephone being turned off and that he would teach appellant not to do it again. Long then attacked appellant, threw him on the ground, began choking him, and threatened to kill him. Appellant yelled for Winder and Mitchell to help him, and Winder finally told Long to stop because appellant had a gun. Long said he did not care because he had a gun in the car.

Appellant went to his bedroom and retrieved his .32 caliber H & R six shot revolver while Long was getting into his car. After he reached the front door, appellant said he saw something in Long's hand, although Winder denied that Long was holding anything. After Long started the car, appellant came onto the front porch and fired a shot that went through the windshield. The car lurched into the bushes.

Appellant admitted that he fired four or five shots at Long. He also admitted to pulling Long out of the car, but he indicated that he merely laid him on the sidewalk. Appellant stated that he was very scared, and that he believed Long to be intoxicated and capable of "doing anything." Appellant said that he did not see Whittington until after the shooting, when Winder went over to Whittington's mother's house and Whittington came out and asked what was wrong.

Keith Long died as a result of the gunshot wounds. An autopsy revealed that he had been shot five times. The autopsy also revealed that Long had alcohol present in his blood, urine, and the vitreous humor of his eye. According to Dr. John Smialek, the Chief Medical Examiner for the State of Maryland, the amount of alcohol in Long's body would have had a depressant effect on him. The autopsy also revealed that cocaine was present in Long's urine but not his blood. According to Dr. Smialek, this signified that the cocaine was "no longer having any chemical intoxicating effect on his body."

The police investigation revealed two bullets entered the windshield of Long's car. One of the bullets had lodged in the dashboard of the car. The driver's side window was shattered. A knife with a three-inch blade was found on the front seat of the car.

Appellant also introduced a stipulation that Dr. Nicholas Scotto, if called as a witness, would testify that he examined appellant on April 27, 1994, and that appellant had contusions on his head and contusions and minor lacerations around his neck and right hand.

The jury found appellant guilty of second degree murder.

## DISCUSSION

At the heart of this appeal is the apparent inconsistency between Whittington's testimony at trial and a statement that he gave to Sergeant David Briscoe during the investigation of the shooting. Appellant argues that the trial court erred when it refused to allow him to introduce evidence of Whittington's prior inconsistent statement by either allowing Sergeant Briscoe to "testify that on April 18[th] he did interview Whittington and this is what [Whittington] said to him," or by granting a continuance so that Whittington could be located.

At this point we will set out parts of Whittington's statement to Sergeant Briscoe, read into the record as part of appellant's proffer,[2] and then summarize his testimony at both trials.

Answer: We [Whittington and his mother] were just sitting here. She had just brought me dinner actually and she said she heard, she said what is this? I said it sounds like shots and I really didn't pay much attention to it. I have heard it before.

---

**2.** The statement itself was never offered into evidence, and it appears to be a transcription of a taped interview between Sergeant Briscoe and Whittington. There is no indication that Whittington ever signed the statement or otherwise adopted it. See Md. Rule 5–802.1(a).

And approximately ten to fifteen seconds after that a knock at the door, at the back door of the house. I peeked out the blind, a lady standing there banging on the door. So I assumed something had happened since hearing the shots. I just put two and two together, didn't open the door though. Ran into the front of the house, looked through the blinds in the front of the house and seen the commotion was going on.

A few seconds later we decided to open the door in the front of the house and see what exactly was going on about that time. A gentleman about five eight, five nine, probably two fifteen to two twenty, stout heavy set guy walking around with a gun in his hand, probably with about a three maybe four and a half inch barrel on it. From the sounds of the shots, it sounded like it was medium caliber to me, sounded like it was a .32, .38, .22 maybe.

Looked at the car the victim was in, a white car. He was mumbling words, but I couldn't distinguish them because everything was so hectic. I couldn't understand what he was actually trying to say. That I understand that he said something about an argument or a fight had happened. I heard that much.

At this time I came back in and I seen two women they were just running around frantically not knowing what to do whatever, so at that time I just dialed 911 and asked for the police and ambulance. That's when they arrived and that's about all I know.

\* \* \*

Question: I mean does he [the heavy set guy with the gun] live at that house?

Answer: I can't say that he lives there. I seen him there quite a few times but I don't know if he lives there or not, because I don't know the people that well. I don't get out and go over and speak with them or anything, you know. If we see each other we say, hi, how are you doing? So I assumed he lived there.

Question: Okay, did you say he said anything? Did you hear him say anything?

Answer: I heard him say something about a fight. I also heard something about self-defense, that is self-defense or something of that nature, that's all I can recall right now.

Question: Okay. And you said the person was mumbling, was that the person inside the car?

Answer: No, that wasn't the victim.

\* \* \*

Question: Okay. Do you have anything else you want to add to this statement?

Answer: Um, from this point on I never known to ever be a problem between them. I mean, they seemed like the ideal family. I have seen them out working, cleaning the cars, cutting the grass, I've never seen a disturbed [sic], I have never heard a disturbance from them or anything of that nature. And what I seen tonight shocked me emotionally more than anything you know. Because you kind of look up to people who have got a family, you know, and family oriented things you do together. And I have seen them do, like, work on cars and things of that nature and it just shocked me all together.

Question: Lemont, let me ask you this. Before you heard the shots, did you hear any other noise coming from that direction?

Answer: No. I didn't hear a sound coming from there. That's why when I heard the shots it kind of surprised me in a sense that I haven't heard shots in a while. But I have heard them before, you know, I just got out of the military, so I have heard them before, I know what they sound like, but I have never heard them in this area on this street, you know. I just got here a couple weeks ago.

Question: Okay. Did you notice a man pull the victim out of the car?

Answer: No, I didn't see that.

At the first trial, Whittington testified that he heard arguing coming from the Fontaine house and that, since he had never heard arguing before, he was curious as to what was happening. He went outside onto the front step, and he saw Long walk out of the house and get into his car. A few seconds after Long left the house, Whittington saw appellant come out of the house saying something Whittington did not hear. Appellant followed Long to his car, and, after Long got into the car, appellant reached in and shot Long two times. Whittington then went inside his house and, through the screen door, saw appellant open the car door, drag Long out, slam him on the ground, then shoot him again.

Whittington said that, after appellant fired this last shot, he began yelling at Winder and Mitchell, threatening to kill them next if they did not back up from where they were standing. Whittington was not asked about his statement to Detective Briscoe at this trial.

At the second trial, Whittington testified that he heard arguing, which he found to be unusual. His curiosity piqued, he went outside to the front steps of the house, and he saw Long hurry out of the house and into his car. By the time Long started the car, appellant had come out of the house yelling. He came over to the car, reached in, and shot Long twice. Whittington then saw appellant reach into the car, drag Long out of the car, slam him on the ground, and shoot him again.

Whittington stated that it was at this point that Winder and Mitchell came out of the house in a panic. Appellant told them to stay back and said something to the effect that, if they did not move, he would kill somebody else or everybody else. At this point, Whittington went inside his mother's house and called 911. Whittington also stated that his mother was not home at the time of the incident.

At the second trial, Whittington testified during the first day of the two-day trial and was excused by both counsel. At the beginning of the second day of trial, defense counsel informed the trial court that he needed to recall Whittington

as a witness. The trial court responded by pointing out that Whittington had been excused after his testimony, that he had not been subpoenaed by the defense, and that he lived out-of-state. Defense counsel asked that he be granted a continuance to issue a subpoena for Whittington if he could not be immediately located. The State's Attorney provided defense counsel with information he had regarding Whittington's address and telephone number.

After the available defense witnesses testified, the issue was revisited. Defense counsel told the trial court that appellant's brother had been trying to locate Whittington for most of the day but had been unsuccessful. Defense counsel stated:

Your Honor, last night after court was over, I went through my file very, very carefully. In fact, I looked at every sheet of it just to be sure nothing was overlooked. And contained in the file, Your Honor, was a document which is four pages. And if you look at this, Your Honor, it indicates that it's a statement of Gwen Yolanda West [her relationship to this case is not explained, and she testified at neither trial].

And I started to read through it, and halfway down is an interview that starts right in the middle of this statement of Lemont Antonio Whittington.

And I'm not, Your Honor, suggesting that I'm totally without fault here, but I had always assumed that this is a statement of Gwen Yolanda West because of the appearance of this, and it doesn't indicate here, you know, that it's a statement of Whittington.

And I went through it, and in this statement, Your Honor, which was also recorded, he states essentially that he saw none of the events that he testified to in this case. That he saw the Defendant outside with a gun talking about self-defense, but he didn't see any shooting, none of the things that he testified to. In fact, he was specifically asked, okay did you notice the man pull the victim out of the car? He said no, I didn't see that. Yet he got on the stand yesterday, Your Honor, and told this jury and told you the

Defendant pulled him out and slammed him to the ground, totally contrary.

Defense counsel proffered that he had a witness who would testify that he had been trying to contact Whittington all day but had been unable to locate him. He had contacted the work address Whittington gave the day before and was told that Whittington had been fired "sometime ago." He had also tried the address provided by the State, but Whittington was not there.

Defense counsel requested that he be permitted to call Sergeant Briscoe as a witness and permit him to testify that he interviewed Whittington on the day of the shooting. Defense counsel also wanted Sergeant Briscoe to testify as to what Whittington said in his statement. Defense counsel argued that the testimony was permissible under Rule 5–613(b), which permits extrinsic evidence of a prior inconsistent statement to be introduced without giving the witness an opportunity to explain it where doing so would be "in the interests of justice." If he could not question Sergeant Briscoe about Whittington's statement, defense counsel asked that he be granted a continuance to issue a subpoena for Whittington.

The State's Attorney responded that the statement, along with all other police reports, had been provided by him to defense counsel months previously and that another person in his office had provided all the documents a second time. He pointed out that the first paragraph of the officer's notes mentioned that the interview included Lemont Whittington. The State also stated that the report had been provided to appellant's former counsel before the first trial, and that Whittington's testimony the previous day was consistent with his testimony at that trial.

The trial court refused to permit defense counsel to call the officer as a witness. It found that it would be against the interests of justice if Whittington was not permitted to explain or deny any contradictions:

Based on what's presented to me, Mr. Whittington, the statement is something which has been in play in this case since 1994. And I guess it boggles my mind that it would have been discovered for the first time last night. And after a previous trial in which the State's representation is, and I have no reason to doubt that, is that Mr. Whittington testified essentially the same at the earlier trial as he did at this time.

And just as counsel has concluded, defense counsel has concluded, that Mr. Whittington was lying when he gave his address yesterday, and made some reference as to where he was working, because he is not today at the address which the State had. But actually as I recall the address that he gave yesterday it was a location other than Seaford, Delaware, which was the address I think where he has been trying to locate him.

But I think it illustrates that whatever address he gave yesterday does not agree with what's on the form where you are trying to locate him, doesn't necessarily mean he was lying yesterday. There may not be an inconsistency or if there is there's a perfectly innocent and logical explanation for it. And I think that's what [Rule 5-613] in subparagraph (a) recognizes.

And under these circumstances, while I recognize that it may well have an impact on the defense, to permit it in without Mr. Whittington being given the opportunity to explain or deny any inconsistencies seems to me to be really against the interest of the [sic] justice as well.

The trial court also denied defense counsel's request for a continuance, noting that defense counsel had not subpoenaed Whittington and that both counsel had specifically excused him after he had testified.

I.

■ It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence, and, thus, we do not disturb a trial court's evidentiary ruling absent error or

a clear abuse of discretion. *Blair v. State,* 130 Md.App. 571, 592, 747 A.2d 702 (2000). *See also Yorke v. State,* 315 Md. 578, 585, 556 A.2d 230 (1989) (citing *Crawford v. State,* 285 Md. 431, 404 A.2d 244 (1979), citing *Boblits v. State,* 7 Md.App. 391, 400, 256 A.2d 187 (1969), *cert. denied,* 256 Md. 743 (1970)); *Tomolillo v. State,* 4 Md.App. 711, 716, 245 A.2d 94 (1968); *Koprivich v. State,* 1 Md.App. 147, 153, 228 A.2d 476 (1967).

■ The Court of Appeals has defined the abuse of discretion standard as " 'a reasonable decision based on the weighing of various alternatives.' There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court.' " *Metheny v. State,* 359 Md. 576, 604, 755 A.2d 1088, (2000), quoting *In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110 (1997). Thus, where a trial court's ruling is reasonable, even if we believe it might have gone the other way, we will not disturb it on appeal.

The ruling at issue in this case involves the "interests of justice" provision of Maryland Rule 5–613(b). At the outset, we note that the rules of evidence, both State and federal, were promulgated to serve the interests of justice. Maryland Rule 5–102 states that "[t]he rules in this Title shall be construed to secure fairness in administration, eliminate unjustifiable expense and delay, and promote the growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Likewise, Federal Rule of Evidence 102 provides that "[t]hese rules shall be construed to secure fairness in administration, elimination of unjustifiable expense and delay, and promotion of growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined." Fairness in arriving at the truth is evident throughout the rules. For example, the rules require that only relevant evidence be admitted, Maryland Rule 5–402, Fed.R.Ev. 402; but even relevant evidence is to be excluded if the prejudicial effect of that evidence outweighs its probative value, Maryland Rule 5–403, Fed.R.Ev. 403.

Maryland Rule 5–613 provides:

## Rule 5–613. PRIOR STATEMENTS OF WITNESSES

(a) **Examining Witness Concerning Prior Statement.** A party examining a witness about a prior written or oral statement made by the witness need not show it to the witness or disclose its contents at that time, provided that before the end of the examination (1) the statement, if written, is disclosed to the witness and the parties, or if the statement is oral, the contents of the statement and the circumstances under which it was made, including the persons to whom it was made, are disclosed to the witness and (2) the witness is given an opportunity to explain or deny it.

(b) **Extrinsic Evidence of Prior Inconsistent Statement of Witness.** Unless the interests of justice otherwise require, extrinsic evidence of a prior inconsistent statement by a witness is not admissible under this Rule (1) until the requirements of section (a) have been met and the witness has failed to admit having made the statement and (2) unless the statement concerns a non-collateral matter.

The corresponding federal rule is as follows:

(a) **Examining witness concerning prior statement.** In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

(b) **Extrinsic evidence of prior inconsistent statement of witness.** Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in rule 801(d)(2).

Fed.R.Ev. 613.

An essential difference between these corresponding rules relates to intrinsic evidence regarding a prior inconsistent statement and responds to criticism of the Rule of Queen

Caroline's Case, which required providing the witness with a copy of a written prior inconsistent statement. Under the federal rule, the witness may be cross-examined about a prior inconsistent statement without being shown the statement, although opposing counsel may see it upon request. Under the Maryland rule, the witness must be given an opportunity to explain or deny the statement before he or she leaves the stand. Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 1302(F)(1) (2d ed.1993). *See also Wright v. State,* 349 Md. 334, 365–66, 708 A.2d 316 (1998) (Chasanow, J., concurring and dissenting). As noted by Judge Chasanow, this modification of the federal rule by Maryland Rule 5–613 provides somewhat greater protection to parties impeached by prior inconsistent statements than its federal counterpart. *Wright,* 349 Md. at 366, 708 A.2d 316.

Subject to the "interests of justice" exception, both the State and federal rules provide a witness with the opportunity to explain or deny a statement before extrinsic evidence of a prior inconsistent statement is admitted. With respect to the "interests of justice" exception, although the rules are phrased differently, the effects of the rules on a proceeding are substantially the same. Thus, federal materials are instructive on this matter.

Whittington was never questioned about his statement to Sergeant Briscoe, but appellant argues that the statement should have been admitted in the "interests of justice." He claims that the statement was "so glaringly inconsistent with the witness's trial testimony that either the statement or his testimony were [sic] false and grossly misleading"; that the discovery was made "at the eleventh hour" by defense counsel; the discovery was made "in good faith"; and Whittington's credibility was central to the State's case, since the other eyewitnesses were members of Long's immediate family.

The State contends that the prior statement was not so "glaringly inconsistent" with Whittington's trial testimony in both this and the earlier trial, and that it was uncertain whether Whittington had lied about his address and his em-

ployment. The State also pointed out that the statement had been provided to defense counsel on two prior occasions, well before both trial dates.

Neither party cites any case to guide us in determining precisely what the "interests of justice" would require in order for extrinsic evidence of a prior inconsistent statement to be admitted without the offering party having complied with section (a) of the rule.[3] To be sure, case law on the "interests of justice" provision of both the Maryland and the federal rule is sparse.

Appellant suggests that such a case might be where counsel made a "good faith eleventh-hour discovery of the statement after the witness has become unavailable," citing L. McLain, *Maryland Rules of Evidence* 168 (1994 ed.). This position is supported by the Reporter's Notes to Md. Rule 5–613, stating that "the interests of justice" provision may be invoked "where the statement was by a hearsay declarant who did not testify [see Rule 5–806], or where the statement was not discovered until after the witness had become unavailable."

Another commentator, writing on Rule 613 of the Federal Rules of Evidence, suggests that the foundational requirements may be dispensed with when the party does not learn of the prior inconsistent statement until the witness leaves the courthouse and is no longer under the court's jurisdiction. He states that "[w]hen a prior statement comes to counsel's

---

**3.** By their arguments, the parties have framed the issue in terms of an interpretation and application of the rules of evidence. *See Chambers v. Mississippi,* 410 U.S. 284, 302–303, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) (mechanistic application of the State's hearsay rule violated the defendant's Sixth Amendment right to confront witnesses); *Green v. Georgia,* 442 U.S. 95, 97, 99 S.Ct. 2150, 2151, 60 L.Ed.2d 738 (1979) (exclusion of hearsay testimony based on mechanistic application of state rules of evidence violated the defendant's Fourteenth Amendment due process rights); *Foster v. State,* 297 Md. 191, 212, 464 A.2d 986 (1983) (finding error in the trial court's refusal to allow in hearsay evidence critical to defendant's case and bearing "persuasive assurances of trustworthiness"). *But see Montana v. Egelhoff,* 518 U.S. 37, 53, 116 S.Ct. 2013, 2022, 135 L.Ed.2d 361 (1996) (limiting the holding of *Chambers* ). Accordingly, we will limit our discussion to the rules of evidence and their application in this case.

attention after the witness has testified, and the witness, through no fault of counsel, is not available to be recalled, the court would be justified in dispensing with the witness's right to explain or deny." 3 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 613.05[4][a] (Joseph N. McLaughlin ed., 2d. ed.1997) (hereinafter "Weinstein" or "Weinstein's").

Weinstein sets forth the following factors for a judge to consider when deciding whether to waive the foundational requirements of Rule 613(b):

[1] The practicability of recalling the witness. [2] The significance of the issue to which the statement relates. [3] The probative value of the statement for impeachment purposes. [4] The consequences of not allowing the statement to be used. [5] The efficacy of an instruction if the jury has been made aware of the statement [that the impeached witness had no opportunity to explain or deny. *See United States v. Wilson,* 490 F.Supp. 713, 719–20 (E.D.Mich.1980), *aff'd* 639 F.2d 314 (6th Cir.1981) ].

Weinstein's at § 613.05[4][b].

Weinstein's commentary implies, and the orderly administration of justice requires, an obligation of reasonable diligence on the part of counsel to be aware of a witness's prior statements or testimony when that witness takes the stand. Weinstein cautions that judges should use the "interests of justice" provision to admit evidence sparingly and should not consider dispensing with the foundational requirements unless counsel did not know of the statement prior to the witness's testimony and the witness was unavailable to be recalled. Weinstein's at § 613.05[4][c].

Within this context, Weinstein also notes that a judge should not allow a prior inconsistent statement to be introduced to a jury under the "interests of justice" provision if "the judge suspects the witness would deny or explain [it] away." Weinstein's at § 613.05[4][c]. This would discourage attorneys from introducing prior inconsistent statements under the "interests of justice" provision after having declined or refused to call the declarant as a witness because of the

possibility that the witness could explain the statement or would deny having made it. Weinstein's at § 613.05[4][c], citing *United States v. Hayutin*, 398 F.2d 944, 952–954 (2d Cir.)(1968).

Our review reveals two federal cases that address the "interests of justice" provision of the federal rule. The first, a federal asbestos case, addresses the availability of the witness and the practicability of recalling him, since the witness had been excused from the Georgia court and returned to his Virginia home, the diligence of the appellant's attorney in knowing or learning about the prior inconsistent statement, and the consequences of not admitting the statement. *Wammock v. Celotex Corporation*, 793 F.2d 1518, 1520–21 (11 th Cir.1986), *opinion withdrawn on other grounds*, 835 F.2d 818 (11 th Cir.1988). The second case discusses the significance of the issue to which the statement related as well as the probative value of the statement for impeachment purposes. *In re Corrugated Container Antitrust Litigation*, 756 F.2d 411, 416 (5 th Cir.1985). In that case the court found that, where the impeachment value of the excluded evidence would be minimal on a crucial issue, the "interests of justice" are not met. *Id.*

We find *Wammock* to be particularly instructive because the facts of that case are similar to the facts in this case. In *Wammock*, an expert witness called by the plaintiff testified in apparent contradiction to testimony that he had given in other cases. *Wammock* 793 F.2d at 1520–21. Plaintiff-appellee's expert witness, Dr. Schepers, testified frequently in asbestos litigation. In previous asbestos trials, he had testified that he had written to U.S. Gypsum Company in response to advertisements for products containing asbestos but that he did not recall having had dealings with defendant-appellant National Gypsum.

At the *Wammock* trial, Dr. Schepers testified to various matters, including the history of general medical knowledge of the potential hazards of asbestos from the 1930s to the time of the trial. He also testified that he had corresponded with

National Gypsum in the late 1950s in response to advertisements indicating that asbestos was one of the ingredients in its gypsum products. Dr. Schepers testified that he advised National Gypsum that it would be "terrible to hide" asbestos with otherwise safe products. *Wammock* at 1520. No copies of any such correspondence were produced. Dr. Schepers was dismissed by both parties, and he returned to his out-of-state home.

Defense counsel stated that he had been unaware of these inconsistencies until doing additional research after Dr. Schepers's testimony. Defense counsel further advised that he could not locate Dr. Schepers. The trial court, although it made no specific finding of availability, premised its deliberations on the witness's unavailability and refused to admit Dr. Schepers's prior inconsistent testimony into evidence.

The Eleventh Circuit Court of Appeals affirmed, noting that, while the defendant's counsel may have had no knowledge of specific prior inconsistent statements, he did have sufficient knowledge of the witness's past performance to realize that his testimony in the present case that he corresponded with National Gypsum was inconsistent with the "general body of testimony" in other cases. *Wammock* at 1524. In other words, he knew that Dr. Schepers's previous testimony indicated no communication of his concern to National Gypsum about its products.

The Court held that the case did "not involve the type of subsequently discovered prior inconsistent statements that would require a lower court to admit those statements in the witness's later absence." *Wammock* at 1525. The Court also stated:

> [W]here there is a reasonable explanation for the prior inconsistent statement [that Dr. Schepers had reviewed records prior to the trial and located documents tying his former laboratory to National Gypsum] and the witness is no longer available to present it, the interests of justice do not necessarily weigh more heavily in favor of admitting the prior statement than excluding it.

*Wammock* at 1526. This conclusion is not unlike the trial court's observation in this case that "to permit [the evidence] in without Mr. Whittington being given the opportunity to explain or deny any inconsistencies seems to me to be really against the interest of the [sic] justice as well."

In both cases, the witnesses provided testimony at trial that was different than statements they had made in the past. In *Wammock*, these statements were made during previous trial testimony. In this case, the inconsistency is found in an investigation statement that does not appear to have been acknowledged or adopted by Whittington. Certainly, Whittington's trial testimony in both cases was substantially the same. In both cases, the witness testified, was dismissed by both parties, and apparently returned to his out-of-state residence. Then, somewhat like the appellant's lawyer in *Wammock*, who did further research to locate specific instances of inconsistent testimony, appellant's attorney in this case reviewed his file, discovered Whittington's statement, and found inconsistencies that, as he admitted, he could, and perhaps should, have known about prior to appellant's second trial.

Furthermore, as the trial courts in both cases pointed out, there may have been a reasonable explanation for the inconsistencies, or at least some of the inconsistencies, complained about. In *Wammock* there was reason to believe that the witness might say that the previous cases did not involve National Gypsum and his memory was refreshed by certain documents. Here, of course, there is no proffered explanation of the inconsistency. On the other hand, the circumstances were such that, even if the statements were not reconciled, the inconsistency might have been explained. For example, Whittington may have withheld information from the officer simply because he did not wish to become involved or, perhaps, because he did not want to expose his mother to possible retaliation or harassment from her neighbors.

Consideration of the significance of the issue to which the statement relates, its impeachment value, balancing the consequences of not permitting the statement against the likelihood

of a reasonable explanation, and the efficiency of a jury instruction explaining that the statement is being heard without comment from the maker of the statement, are somewhat interrelated issues. In the context of this case, Whittington testified as an eyewitness to the shooting, the central issue of the case. Thus, his testimony related to a significant issue. He was not, however, the only witness testifying to what transpired, and his trial testimony was contradicted by appellant.

The impeachment value of Whittington's statement, even if the inconsistency could not be denied or explained, is not as easily analyzed. Obviously, the quality of his testimony hinged on what he actually saw, and his general credibility may have been undermined by the inconsistency. As the only non-family witness, his trial testimony may have been considered important both in its own right and to the extent that it corroborated the testimony of Winder and Mitchell. Clearly, the statement given to Sergeant Briscoe tended to support appellant's testimony that Whittington did not come out of the house until after the shooting. Even if the jury were to learn about Whittington's prior statement, it could choose to believe or disbelieve all or a part of that statement. If Whittington's testimony was totally disregarded, there was still sufficient evidence from others, if believed, to convict appellant. Moreover, Whittington's testimony at this trial was almost identical to that given at appellant's previous trial. The State may have been allowed to use that testimony, which was given under oath, to rehabilitate Whittington. Md. Rule 5–616; *Blair*, 130 Md.App. at 595–96, 747 A.2d 702; *Holmes v. State,* 350 Md. 412, 425, 712 A.2d 554 (1998). The trial court apparently recognized the potential importance of the statement and the impeachment value of the statement as reflected by its comment, "I recognize that it may well have an impact on the defense," but still concluded that such an impact did not overcome the unfairness of not permitting Whittington an opportunity to explain or deny the inconsistencies.

 Faced with a request to admit a prior inconsistent statement under the "interests of justice" exception to Maryland Rule 5–613, we believe it is appropriate and useful to consider the request against the backdrop of the factors suggested by Weinstein: (1) the practicability of recalling the witness, including that witness's availability; (2) the significance of the issue to which the statement relates; (3) the probative value of the statement for impeachment purposes; (4) balancing the consequences of not allowing the statement into evidence with the likelihood that, if questioned, the witness could deny the statement or provide a reasonable explanation; and (5) the efficacy of an instruction to a jury that has heard a prior inconsistent statement without comment by the witness who made the statement. To that calculus we would include consideration of the good faith and reasonable diligence of counsel in discovering the prior inconsistent statement sought to be introduced. These factors provide a conceptual matrix within which the totality of all the applicable circumstances can be considered in arriving at an "interests of justice" determination. We do not hold, however, that the trial court must individually evaluate and expressly comment on each factor.

The trial court specifically pointed out the possibility that Whittington could explain his statement, the fact that defense counsel had had access to the statement for months, and the fact that Whittington's testimony in both trials was essentially the same. The trial court provided valid reasons for not admitting the statement, finding that the "totality of the circumstances" along with its reading of the rule mitigated against admitting the statement. We hold that the trial court conducted a sufficient inquiry into the matter and did not abuse its discretion when it refused in the "interests of justice" to allow Sergeant Briscoe to testify regarding Whittington's statement.

## II.

Appellant further argues that the trial court erred in refusing to grant him a continuance so he could subpoena Whittington.

■ It is a basic principle that rulings on requests for continuances are within the sound discretion of the trial judge and will not be disturbed on appeal absent an abuse of that discretion. *Evans v. State,* 304 Md. 487, 514, 499 A.2d 1261 (1985); *Smith v. State,* 103 Md.App. 310, 323, 653 A.2d 526 (1995); *Whack v. State,* 94 Md.App. 107, 117, 615 A.2d 1226 (1992), *cert. denied,* 330 Md. 155, 622 A.2d 1196 (1993); *Burgess v. State,* 89 Md.App. 522, 534, 598 A.2d 830 (1991), *cert. denied,* 325 Md. 619, 602 A.2d 710 (1992).

■ To establish that a trial court abused its discretion in denying a request for a continuance to obtain the presence of a trial witness, the complaining party must show: first, that he had a reasonable expectation of securing the witness within a reasonable time; second, that the evidence was competent and material and that the case could not be fairly tried without the witness; and, third, that he made diligent efforts to obtain the witness. *Whack,* 94 Md.App. at 117, 615 A.2d 1226 (citing *Jackson v. State,* 288 Md. 191, 194, 416 A.2d 278 (1980)).

■ In the present case, appellant clearly failed to carry his burden with respect to the first prong. The trial court expressly found that appellant had shown no expectation of locating Whittington within a reasonable time:

[T]here has been no representation that would lead me to think that the defense has any expectation of being able to locate Mr. Whittington, based on what you have told me. And it does not seem to me to be an appropriate matter to take a recess that may reach into days in a jury trial when we don't know if the person will be able to be located or to be produced as a witness during that period of time.

Appellant's citation to *Worthen v. State,* 42 Md.App. 20, 399 A.2d 272 (1979), for the proposition that "when trial counsel has 'heard for the first time the night before trial' about a newly acquired State's witness who would impeach the accused, it was an abuse of discretion to deny the defense a reasonable continuance" is unpersuasive, as the circumstances of that case are inapposite. Not only was Whittington not a "newly acquired State's witness," counsel had knowledge of

Whittington and access to his statement months prior to trial. Moreover, in *Worthen,* the witness apparently was available and the continuance was requested "to investigate and plan a defense or counterattack" to the witness's potentially devastating testimony, *Worthen,* 42 Md.App. at 23, 399 A.2d 272, rather than to locate the witness.

We find no abuse of discretion in the trial court's refusal to grant appellant a continuance for the purpose of subpoenaing Whittington.

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**